IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Securities and Exchange Commission, | Case No. 3:82 CV 29 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| James L. Douglas, | |
| Defendant. | |

## INTRODUCTION

Nearly thirty years ago, Defendant James Douglas (a/k/a James Cooper) settled his securities fraud case with the Securities and Exchange Commission ("SEC"). In 1988, after five years of non-payment, this Court held Defendant in contempt, ordering him to pay the full judgment entered against him in his settled action. The U.S. Marshals Service was unsuccessful in locating Defendant in an attempt to enforce the judgment. With no word from Defendant, and his whereabouts unknown, the arrest warrant was returned unexecuted.

We now know that Defendant had absconded to Europe, later returned to the United States and, unsurprisingly, the SEC had lost interest in his case. But like the proverbial elephant, the SEC had not forgotten about Defendant's unpaid judgment. Pending before this Court is the SEC's Motion to find Defendant in Civil Contempt (Doc. 2). The SEC asks this Court to find Defendant in contempt, for a second time, and order him to pay what he owes -- with interest. The matter has been fully briefed (Docs. 2, 10 & 13), and this Court held a lengthy hearing on the pending Motion.

## BACKGROUND

In January 1982, the SEC filed a complaint against Defendant alleging he raised over $7.5 million by offering and selling unregistered securities to more than 300 individuals (Doc. 2-1 at 11). According to the SEC, the securities took the form of interests in limited and general partnerships formed for the purpose of investing in oil and gas drilling. Defendant's disclosures to investors were filled with misrepresentations of the costs of drilling and refurbishing wells, as well as projected profits. Defendant also lied to investors about contributing services or cash to the partnerships, and failed to disclose that he was sharing revenues with individuals who solicited contributions from investors. In certain instances, Defendant charged multiple partnerships for the full costs of drilling the same well (Doc. 2-1 at 11).

In August 1983, Defendant agreed with the SEC to a scheduled repayment of his illegal gains, though he neither admitted nor denied the allegations in the complaint (Doc. 10 at 3). Pursuant to the 1983 Disgorgement Order, Defendant was to pay $200,000 in installments over three years (Doc. 2-1 at 12). However, by 1986, Defendant missed two out of the three installment deadlines and failed to pay in full, leaving an unpaid balance of $78,024.71. (With post-judgment interest, Defendant owed at the start of the hearing $1,790,730.22 and counting (Doc. 20)).

The SEC repeatedly attempted to collect the remainder of the unpaid judgment, but was thwarted by Defendant's pattern of lies and false promises to pay. As of 1988, Defendant had yet to pay the full judgment (Doc. 2-1 at 14). This led the SEC to file a motion to hold Defendant in contempt of court. After a show-cause hearing, a warrant for his arrest was issued. After nine years, the U.S. Marshals Service was unable to track Defendant, despite his contention that he "has been omnipresent and exceedingly visible here in the United States" (Doc. 10 at 2). As it turns out, Defendant, after pledging to pay off the balance with proceeds from the sale of his home, took those

proceeds and fled to Europe where he escaped detection. Whatever the efforts to locate Defendant, the fact remains the warrant was returned unexecuted in 1997, and the contempt order was never purged (Doc. 2-1 at 14).

Defendant came to the SEC's attention in recent years, after returning to the United States and filing suit, in Florida state court, for damages as the executor of his wife's estate, against a tobacco company regarding his wife's cigarette habit. A jury returned a verdict in favor of his wife's estate. (In March 2012, the Florida Court of Appeals affirmed a $2.5 million judgment in his favor; the Florida Supreme Court has agreed to hear the case, scheduling oral argument for September 2012.) Upon learning of the jury verdict in January 2011, the SEC sent Defendant a letter demanding that he pay the remaining amount of the judgment together with interest, to which Defendant responded, for the first time, that he had already paid the judgment in full (Doc. 2-1 at 14–15).

In an unsworn declaration, Defendant claims he paid the balance of the judgment, approximately two years after the August 1983 Order. However, as the SEC notes, Defendant has nothing to show for this claim of final payment. Defendant was not being truthful, and later backtracked from his story that he fully paid the judgment. He concedes the judgment remains unpaid, but his new defense is to plead poverty as a reason for avoiding the court-ordered disgorgement (Doc. 10 at 13).

Defendant also attacks the ability of this Court to award post-judgment interest on the remaining balance (Doc. 10 at 8–12). This Court recently held the disgorgement to be a "money judgment" under 28 U.S.C. § 1961(a), properly giving rise to post-judgment interest (Doc. 18).

Defendant filed a Motion for Reconsideration, arguing this Court reached a "mistaken conclusion" in finding that post-judgment interest was appropriate (Doc. 25). This Court denied that Motion (Doc. 32), leaving a single issue remaining for determination: Defendant's ability to pay.

3

### STANDARD OF REVIEW

The Supreme Court has recognized the defense of "inability to comply" with an enforcement order in civil contempt proceedings, but Defendant bears the burden of establishing the defense. *See United States v. Rylander*. 460 U.S. 752, 757 (1983). The various federal circuits have likewise recognized that a party's complete inability -- due to poverty or insolvency -- to comply with an order to pay is a defense to a charge of civil contempt. *See Electrical Workers Pension Trust v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 379 (6th Cir. 2003); *see also Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998); *Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir. 1995).

In the Sixth Circuit, a party can demonstrate an inability to pay by showing "categorically and in detail" why he is unable to comply with a court order. *Electrical Workers*, 340 F.3d at 379; *see also Rolex Watch USA, Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996); *N.L.R.B. v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612, 616 (9th Cir. 1973). The Second Circuit likewise articulated a high burden, requiring parties to establish an inability to pay "clearly, plainly and unmistakably." *Huber*, 51 F.3d at 10. Conclusory assertions of insolvency will not carry the day. *See SEC v. Bilzerian*, 112 F. Supp. 2d 12, 16 (D.D.C. 2000) (mere claims of poverty -- wholly unrealistic and without adequate proof -- are insufficient).

In evaluating Defendant's failure to comply with the Disgorgement Order, this Court must consider whether he "took all reasonable steps" within his power to comply. *Electrical Workers*, 340 F.3d at 379 (citing *Peppers v. Barry*, 873 F.2d 967, 969 (6th Cir. 1989)); *see also United States v. Hayes*, 722 F.2d 723, 725 (11th Cir. 1984) (good faith, diligent, and substantial efforts are insufficient; a party must make *all* reasonable efforts). At least one circuit has gone as far as requiring a party "to make in good faith all reasonable efforts to secure" the financial resources necessary to pay the judgment. *See Chicago Truck Drivers v. Brotherhood Labor Leasing*, 207 F.3d 500, 506 (8th

4

Cir. 2000) (quotation omitted). Other courts have presumed an ability to pay so long as the party was able to pay at some time in the past. *See In re Res. Tech. Corp.*, 624 F.3d 376, 387 (7th Cir. 2010); *SEC v. Princeton Economic Intern. Ltd.*, 152 F. Supp. 2d 456, 459 (S.D.N.Y. 2001).

Moreover, the Sixth Circuit has emphasized that a party must show "that his present inability to comply is not his own fault or the result of self-induced inability." *Electrical Workers*, 340 F.3d at 383. Courts have extended this principle to situations where a party created his inability to pay through the enjoyment of a lavish lifestyle, including vacation homes, luxury vehicles, trips, and the questionable assignment of assets to others. *See, e.g.*, *SEC v. Solow*, 682 F. Supp. 2d 1312, 1323–24 (S.D. Fla. 2010) (impossibility defense unavailable where defendant created his inability to comply with disgorgement order); *cf. SEC v. Showalter*, 227 F. Supp. 2d 110, 115–21 (D.D.C. 2002) (defendant failed to prove inability to pay or good faith attempts to comply and lived an extravagant lifestyle). In other words, the defense is unavailable unless Defendant can prove "that he is not responsible for the present inability to pay." *Electrical Workers*, 340 F.3d at 383.

## ANALYSIS

Defendant alleges he is unable to pay the remaining balance of the Disgorgement Order obtained against him by the SEC, arguing that the evidence presented at the hearing shows "that [he] does not have the present ability to pay anywhere close to the nearly $2 million the SEC seeks" (Doc. 10 at 14). He protests that he is "clearly, plainly and unmistakably unable to satisfy [the order] after making all diligent efforts" (Doc. 10 at 15). This Court disagrees. As explained below, Defendant has been everything but forthcoming about his financial condition and business dealings and, to the extent Defendant lacks the *present* ability to pay, he has no one to blame but himself. The evidence is abundantly clear that he was more than able to pay the judgment in the past.

**Defendant Has Not Been Truthful About His Financial Condition**

Following the lengthy hearing, and all the evidence offered by Defendant, five points are clear. First, Defendant and his businesses, First New York and Third New York, under-reported income on their tax returns by several hundred thousand dollars in the past few years. Indeed, as SEC accountant Donald Ryba noted, there is a significant difference between what is reflected in Defendant's books and what was actually reported on tax returns (Tr. Vol. 5 at 46–47). Specifically, Defendant and his businesses failed to report approximately $334,721 in rent and management fees from 2008 to 2010 alone (Ex. 69). This is troubling, given that the preparation of tax returns for these rental properties should have been "fairly straightforward" (Tr. Vol. 5 at 66).

This evidence of under-reporting conflicts with the testimony of Teddi Aberle, Defendant's personal accountant, who testified that Third New York had no income in the last two years (Doc. 29 at 11–12). Aberle also testified that every penny that came into one of Defendant's businesses was accounted for and reported to the IRS. Aberle, however, never reviewed bank statements -- she assembled tax returns by relying on information given to her. Notably, Aberle's tax return preparation was inconsistent with professional standards and, during the hearing, Ryba identified various discrepancies and deficiencies in Aberle's work papers (Tr. Vol. 5 at 66, 104–05 & 114–15). This Court also agrees with Ryba that a rental property such as Third New York should have been reported as income -- not treated as an investment (Tr. Vol 5 at 57). Although Defendant's financial information prior to 2008 was not introduced, this Court would not be surprised, given Defendant's track record, if under-reporting rent and fees has been the norm for Defendant and his entities for quite some time.

Second, Defendant neglected to disclose his Social Security income in his 2010 tax returns. Aberle suggests that such failure was "no harm, no foul" because that income would not have been

6

taxable. As Ryba noted, just because certain income will not be taxed does not excuse one from disclosing it on his returns. More importantly, Defendant's Social Security income would have been taxable had Defendant been truthful in his returns by accurately reporting all income, rather than under-reporting as discussed above (Tr. Vol. 5 at 112–13).

Third, Defendant has been dipping into corporate accounts at Cumberland County Bank to cover his living expenses. The SEC introduced evidence that Defendant has personally spent hundreds of thousands of dollars in the past few years -- amounts that far exceed his reported average annual income of $1,913 for the past four years. *See* Ex. 76–79. For instance, from 2008 to 2011, Defendant spent some $354,344 on personal expenses (*e.g.*, groceries, utilities, membership fees, luxury vehicles, cash, mortgage payments, credit card bills) from his three corporate accounts not associated with his rental business (Tr. Vol. 5 at 81; Ex. 76 & 79).

While Aberle testified that some payments were business-related (Tr. Vol. 5 at 140–41), her notion that Defendant only took out $22,000 to cover personal expenditures or that he has given more than he has taken out of the business accounts (Doc. 29 at 49 & 55) is implausible and uncompelling. Aberle admitted she did not actually review the underlying records for items listed as personal expenses (Ex. 76). Rather, she reviewed spreadsheets that were prepared by Defendant on Quickbooks, which questions the veracity of the documents and the accuracy of her analysis (Tr. Vol. 5 at 147). This Court finds that any confusion regarding the purpose of these payments is solely attributable to Defendant's co-mingling of funds.

7

Fourth, Defendant has numerous real estate assets, including personal homes in Tennessee, Florida and New York, as well as substantial interests in dozens of properties in Tennessee. Defendant's argument that First New York -- and not him personally -- owns some of these properties is refuted by various bank records, which unequivocally list him as owner in an individual capacity (Tr. Vol. 5 at 100). Indeed, a review of records from Cumberland County Bank and Highland Federal Savings and Loan (Ex. 82 & 83) confirms that Defendant is the personal owner of at least eleven Tennessee properties associated with First New York (Tr. Vol. 5 at 95–96; Ex. 80 & 82–83). The deeds also list Defendant as part-owner of nineteen other properties in Tennessee purchased as a joint venture between three individuals (Ex. 81–83), though documents from Highland Federal list Defendant as sole owner of at least nine of those properties (Tr. Vol. 5 at 97; Ex. 81). The deeds themselves do not even mention First New York. Moreover, a customer activity account sheet from Highland Federal supports the conclusion that Defendant is the owner of at least fifteen properties (Ex. 84).

All this rebuts Defendant's contention that his Florida residence is the only property he owns personally (Doc. 29 at 22). This Court is also unpersuaded by the argument that some of these properties are encumbered by mortgages; there is clearly *some* value in all this real estate beyond the rental income. For instance, the combined depreciable basis of the properties is well over $2 million ($1,311,263 [for properties listed on HJF Schedule] + $840,985 [for properties listed on First New York Schedule] = $2,152,248) (Ex. 80 & 81). Moreover, Randall Bond, Defendant's own banker at Cumberland County Bank, confirmed all of Defendant's properties not only have equity, but "[q]uite a bit of equity" (Doc. 22 at 155). And Defendant's 2012 appraisals for the joint venture properties shows some equity in the combined properties (Ex. 98).

8

Fifth, Defendant, as executor and sole beneficiary of his wife's estate, has a substantial interest in the $2.5 million Florida award (Ex. 51).  Defendant, as well as his counsel, are optimistic the Florida Supreme Court will affirm (Tr. Vol. 5 at 191).  In addition to the judgment, Defendant has the ability to seek attorney fees and costs, thereby entitling him to a larger sum of the total recovery (Ex. 50).  While the ultimate outcome depends on the ruling by the Florida Supreme Court, Defendant's present interest cannot be overlooked.  If affirmed, Defendant's ability to comply with the Disgorgement Order will be incontrovertible, as Defendant himself concedes (Tr. Vol. 5 at 192) ("If I prevail [in the tobacco litigation], I'll have enough money to pay the SEC.").

In sum, this Court agrees with Ryba that Defendant's "financial condition is better than what he says" (Tr. Vol. 5 at 116).  In concluding his testimony, Ryba stated (Tr. Vol. 5 at 119):

> If I'm trying to hide income, [Defendant's methods are] a pretty good way to do it.
> If I'm trying to hide assets, again, this is a pretty good way to do it.

Without a doubt, Defendant has more money than he claims, and while neither side is able to put an exact dollar figure on how much he is worth, it is clear he has *some* present ability to pay.  The evidence in this case paints a picture of a persistent pattern of reporting whatever amount of income was necessary to meet Defendant's immediate goal -- *i.e.*, telling the IRS he makes $2,000 a year, while reporting income in excess of $200,000 to banks (Tr. Vol. 5 at 107).  All this, however, is beside the point because even if Defendant is unable to pay the entire disgorgement amount today, the SEC has satisfied this Court that Defendant's inability to pay is self-created.  *See Electrical Workers*, 340 F.3d at 383.

**Defendant's Inability To Pay Is Self-Induced**

While Defendant's evasive bookkeeping makes it nearly impossible to calculate the precise amount he is capable of paying, it is clear he had an ability to pay at various junctures throughout the past thirty years but failed to take "all reasonable steps" to do so. *Id.* at 379 (citing *Peppers*, 873 F.2d at 969). Indeed, the record indicates that rather than paying what he owes, Defendant chose to live an indulgent lifestyle, including luxury vehicles, a castle in Scotland, and dream homes in the United States.

For instance, the SEC introduced evidence of a 1,000 acre ranch owned by Defendant.[1] The ranch, known as "Wildwood Acres," spanned two states (Georgia and Alabama) with a 6,700 square foot Swiss Alpine home (Doc. 22 at 96; Ex. 92). According to a local newspaper, the ranch was "[o]ne of the most beautiful and desirable cattle or horse ranch[es] in [the area]" (Ex. 92). To be sure, Defendant could have complied with the Disgorgement Order with proceeds from the ranch, or by using the ranch to make "all reasonable efforts to secure" the financial resources necessary to pay his judgment. *See Chicago Truck Drivers*, 207 F.3d at 506; *Electrical Workers*, 340 F.3d at 379. Defendant, however, failed to disclose the property to the SEC (Tr. Vol. 5 at 184–85), and the ranch, or at least a large part of it, was ultimately auctioned in 1987. None of the proceeds were allocated toward the Disgorgement Order. Those proceeds were, however, allocated toward other properties (Doc. 14-1 at 26; Ex. 50).

---

[1] The property was divided into multiple parcels, and there is some confusion regarding what interests Defendant transferred and when. Defendant transferred the "Alabama portion" of the ranch to his wife in August 1982, seven months after the SEC commenced its action against him (Doc. 22 at 101–02; Ex. 41). Defendant transferred another portion of the ranch to his wife's trust in July 1983, one month before settling his securities fraud case with the SEC (Doc. 22 at 98; Ex. 40).

In June 1988 -- two months after this Court held Defendant in contempt for not paying the Court's judgment -- Defendant purchased two Florida condominiums (Ex. 93 & 94). At that time, Defendant was already living in Scotland, where he chose to send his three youngest children to boarding school (Tr. Vol. 5 at 199–200). Defendant and his family lived in the Fa'side Castle, a thirteenth century twenty-plus-room castle set on two and a half acres of countryside (Ex. 46). Though Defendant contends he paid £120,000 for the castle (Doc. 22 at 107), documentation from the National Archives of Scotland confirms he paid £310,000 -- roughly equal to $870,000 today (Ex. 45). (Historical Currency Conversions, *available at* http://futureboy.us/fsp/dollar.fsp?quantity=310000&currency=pounds&fromYear=1988.) Notably, the castle was purchased only a month after this Court held Defendant in contempt and issued a warrant for his arrest (Doc. 22 at 110; Ex. 47). The castle was also purchased through a company owned by Defendant which, as the SEC notes, made finding Defendant more difficult (Doc. 22 at 111).

A year after purchasing the castle, Defendant and his wife sold it for £425,000, over one million in today's dollars (Doc. 22 at 114; Ex. 46). (Historical Currency Conversions, *available at* http://futureboy.us/fsp/dollar.fsp?quantity=425000&currency=pounds&fromYear=1990.) Defendant testified that some of his net proceeds went into "business and developing" and toward his "children's schooling" and "savings" (Doc. 22 at 117). When asked about the remainder of the funds, Defendant could not recall (Doc. 22 at 117). Again, rather than purchasing Florida condominiums and a castle in Scotland, Defendant could have easily settled his score with the SEC.

Throughout the years, Defendant possessed numerous other opportunities to pay the remaining balance of the Disgorgement Order but, for whatever reason, chose not to do so. For instance, in 1992, Defendant received $400,000 following an automobile accident (Tr. Vol. 5 at 216). In 2001, Defendant recovered roughly $675,000 of non-taxable income following civil litigation (Tr. Vol. 5

at 216–17). Somewhere around 2003–04, Defendant recovered $125,000 from Blue Cross Blue Shield following a policy dispute (Tr. Vol. 5 at 217). According to Defendant, all these funds went toward purchasing real estate and establishing his business (Tr. Vol. 5 at 218). In other words, Defendant used these funds to purchase the dozens of properties he now tries to hide behind, claiming they are underwater as part of his "poverty" defense.

More recently, in 2008, Defendant received over $250,000 in life insurance proceeds following his wife's death. Defendant, however, did not allocate a single penny of those proceeds towards his SEC debt. Instead, Defendant spent $82,517 purchasing tax liens from the City of Poughkeepsie in New York, $26,098 on credit card bills, over $10,000 in automobile expenses, $19,070 in cash to his son, and deposited slightly over $100,000 into accounts at Cumberland County Bank (Tr. Vol. 5 at 85–87; Ex. 77). Defendant, once again, chose to dodge his responsibility to this Court.

Defendant's extravagant lifestyle is evidenced by more specifics. Defendant sent each of his children tens of thousands of dollars in the last three years. Specifically, Defendant sent his son James Larney between $10,000 and $20,000, his son James Lamar between $10,000 and $20,000, his son James Lamont approximately $30,000, and his daughter Jennifer roughly $25,000. Defendant also purchased vehicles for his children (Doc. 22 at 60–61). Further, Defendant made payments totaling $179,101 to various individuals from 2007 through 2012 (Ex. 78). Although some of these expenses were probably business-related, some -- if not most -- were personal. Defendant failed to report these payments on an IRS Form 1099 (for non-employee compensation), supporting the conclusion they were personal payments and not business expenses (Tr. Vol. 5 at 78). A businessman such as Defendant surely knew to file a 1099.

12

Defendant's own statements to his bank buttress the conclusion that he has enjoyed a lavish lifestyle. In 2007, Defendant reported to the Cumberland County Bank assets in excess of $3.6 million and a net worth of over $2.4 million (Ex. 87). In a separate financial statement, Defendant disclosed over $2.4 million in real estate assets registered in his own name, as well as three Mercedes-Benz vehicles valued at approximately $88,000 and an annual income of over $200,000 (Ex. 88). Defendant also disclosed $160,000 in home furnishings and nearly half a million dollars -- $450,000 to be precise -- in paintings and other collectibles (Ex. 88). For the most part, this same financial information was disclosed to Cumberland County Bank a year earlier (Ex. 91). Although Defendant reported a lower net worth in 2009 (Ex. 90), this is hardly evidence of life as a pauper.

On a final note, Defendant argues he was living off returns from a loan made to First New York. Really? Money spent by Defendant in 2008 and 2009 could not have been from returns on a loan because the value of that alleged loan actually increased (Ex. 68). Like Ryba, this Court cannot fathom how one could spend money that was a return on a loan if that loan amount did not decrease. Moreover, there is absolutely zero evidence that Defendant made loans to First New York or that loans were being repaid to him (Tr. Vol. 5 at 109–110). Considering Defendant's penchant for misinformation, this Court will not take his word for it. Similarly, Aberle, who relies heavily on Defendant, does not cure the defects in Defendant's story. To the contrary, this Court lacks confidence in her testimony which only compounds Defendant's proof problems.

The evidence in this case leads directly to the conclusion that Defendant had plenty of cash and, instead of paying the agreed judgment, went on to live a life of grandeur. Simply put, it is no surprise Defendant is now short on cash, but that is his fault, and his alone. *See Electrical Workers*, 340 F.3d at 383. Purchasing luxury vehicles, expensive paintings, furnishings, cars and real estate cannot be light on one's wallet. Nor can his reckless spending be considered, by any stretch of the

13

imagination, a good faith effort to comply with this Court's Disgorgement Order. *Electrical Workers*, 340 F.3d at 379; *Hayes*, 722 F.2d at 725; *Chicago Truck Drivers*, 207 F.3d at 506. Moreover, divesting oneself of assets that would otherwise have been available to satisfy a disgorgement order has routinely been condemned by the courts. *See, e.g.*, *Solow*, 682 F. Supp. 2d at 1330; *In re Lawrence*, 279 F.3d 1294 (11th Cir. 2002); *Bilzerian*, 112 F. Supp. 2d at 16. This is precisely what Defendant has been doing for nearly thirty years. For these reasons, and for those offered by the SEC at the hearing, Defendant has not proven, "categorically and in detail," that he is unable to comply. *Electrical Workers*, 340 F.3d at 379.

## CONCLUSION

Benjamin Franklin wrote, "the second vice is lying, the first is running in debt." Unfortunately for Defendant, he is guilty of both. Defendant agreed to pay $200,000 nearly three decades ago. Instead of fulfilling his obligations to the SEC, he refused to pay and absconded to Europe, despite facing an order from this Court. Moreover, the evidence does not support Defendant's assertion that he "clearly, plainly and unmistakably" is unable to pay.

Defendant's lavish lifestyle apparently is over, but he has dodged his legal debt long enough, and it is high time for him to pay what he owes. The SEC's Motion (Doc. 2) is granted.

At the end of the hearing, defense counsel requested that this Court, in its equitable powers, modify the applicable interest rate or apply a "blended" rate to reduce the amount owed. The statutory interest rate of 10.74% applies from the "date of the entry of the judgment." 28 U.S.C. § 1961. That rate may seem high by today's standards, but it is properly calculated. And district courts do "not have any discretion to deny or modify the terms [*e.g.*, interest rate] upon which the SEC may receive post-judgment interest under [Section] 1961." *SEC v. Carrillo*, 325 F.3d 1268, 1271 (11th

Cir. 2003). Indeed, the plain language of the statute establishes the applicable interest rate, instructing that the rate "*shall* be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a) (emphasis added); *Carrillo*, 325 F.3d at 1271. The statute does not allow for discretion -- the language is mandatory. Defendant is therefore responsible for the past due principal plus interest. And if he finds the amount due unreasonable, it is the result of his own misconduct for avoiding payment for so long. Accordingly, Defendant's request to modify the interest rate is denied.

    IT IS SO ORDERED.

                                                                          s/ *Jack Zouhary*
                                                           JACK ZOUHARY
                                                           U. S. DISTRICT JUDGE

                                                           August 20, 2012